UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERNEST DURMISHI,

                    Plaintiff,

                                        Case Number 09-11061
v.                                      Honorable David M. Lawson

NATIONAL CASUALTY COMPANY,

                    Defendant.

_____/

## OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT, GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND DENYING DEFENDANT'S MOTION TO STRIKE EXPERT WITNESS

Plaintiff Ernest Durmishi was injured in a motor vehicle accident and suffered serious injuries. He sued his insurance carrier, National Casualty Company, for first-party benefits under Michigan's no-fault insurance law, Mich. Comp. Laws § 500.3101 *et seq.* His main claim is for the value of attendant care benefits furnished by his wife. The defendant refused to pay the benefits demanded. The plaintiff has filed a motion for partial summary judgment seeking an amount equal to 24-hour attendant care at a rate of $26.34 per hour for every day since the Mr. Durmishi was discharged to his home, plus penalty interest and attorney's fees as allowed by Michigan law. The defendant has filed a motion for partial summary judgment, arguing that it is entitled to set off against payment for attendant care services an amount equal to eight hours each day because Mr. Durmishi was injured on the job, and that portion of the benefit is the obligation of his worker's compensation insurer. The defendant also argues that it should not have to pay attorney's fees as a matter of law because Mr. Durmishi refused to attend a medical evaluation as required by state law and the insurance contract. Finally, the defendant has moved to bar testimony from the plaintiff's

vocational rehabilitation expert on the ground that his proposed testimony falls within the scope of common knowledge and therefore would not be helpful to a jury. The Court heard oral argument on the motions on April 19, 2010, after which it permitted the parties to file supplemental briefs to address recent appellate decisions. The Court now finds that fact issues preclude summary judgment for the plaintiff except on the issue of the defendant's obligation to pay penalty interest and attorney's fees for some of the attendant care benefits after thirty days following December 4, 2009, when it had reasonable proof of the claim; the defendant is not entitled to set off an amount for worker's compensation benefits until the plaintiff has a right to those benefits, evidence of which is absent from this record; the defendant's right to a medical examination of the plaintiff is governed by Federal Rule of Civil Procedure 35, with which the plaintiff complied, and therefore there is no basis to deny the plaintiff the right to pursue his claim for attorney's fees as a matter of law; and there is no basis to strike the plaintiff's proposed expert witness at this time. Therefore, the defendant's motion for partial summary judgment will be denied, the plaintiff's motion for partial summary judgment will be granted in part and denied in part, and the defendant's motion to strike the expert witness will be denied.

I.

The accident occurred on August 8, 2008 at about 8:30 in the morning. At that time, the plaintiff was a 31-year-old Albanian man employed by L & D Transport, Inc. as a truck driver. The plaintiff spoke Albanian and Greek and had only minimal English proficiency; he relied on his wife, Erjola Durmishi, to translate for him. The plaintiff was driving a semi-tractor-trailer truck down the exit ramp from northbound M-53 onto 23 Mile Road heading east in Shelby Township, Michigan. Witnesses reported that he took a turn off the exit ramp at a high speed and the police report

concludes that this speed caused cargo inside the vehicle to shift, which caused the truck to roll over. The parties do not dispute that this accident occurred in the course of the plaintiff's employment with L & D Transport. A Shelby Township Fire Department and Emergency Medical Services team responded to the accident and found the plaintiff unconscious and pinned under the steering wheel, but he regained consciousness at the scene and became combative.

The plaintiff was transported to Henry Ford Hospital where he was found to have brain bleeding that required a craniotomy. He remained in intensive care, and after he failed to regain consciousness, additional brain surgeries were performed. The plaintiff regained consciousness, but other complications extended his hospital stay. Eventually, he was discharged on August 19, 2008 to the Rehabilitation Institute of Michigan (RIM), where he was observed to suffer from difficulties with balance, functional mobility, range of movement, self-care, sensory and motor function, and lack of strength and bed mobility. During his stay at RIM, the plaintiff received physical therapy, occupational therapy, speech therapy, neuropsychology therapy, and attended an interdisciplinary rehabilitation program.

The plaintiff was discharged to his own home on August 26, 2008. Just before discharge, on August 22, 2008, case manager Jean Ward stated in a letter that the plaintiff "will continue to require 24 hour supervision following discharge and for the foreseeable future. Mrs. Durmishi has attended education with her husband's therapists and will be providing the necessary supervision and assistance at home post discharge." Pl.'s Mot. Summ. J., Ex. 21, Ward letter. Before the accident, Mrs. Durmishi had been employed in two part-time jobs as a salesperson at Burlington Coat Factory and a cashier at a grocery store. She quit both jobs and began providing 24-hour-per-day care to her husband. Because of her husband's English deficiency, Mrs. Durmishi served as his

interpreter, and she helped him groom, bathe, and dress himself. She also helped him use the bathroom, and woke during the night several times to do so. The plaintiff apparently continued to have weakness on his right side, pain in his right shoulder, problems with his balance, and confusion. Mrs. Durmishi also prepared her husband's meals, making food that he was able to chew with the pain in his jaw, ear, and head, and helped to feed him because of problems with his right arm. She assisted him with his medication by picking up his prescriptions at the pharmacy and ensuring that he took the correct dosage of his medications on schedule. She helped him to move around the apartment and walk up and down the stairs, tasks that he has increasingly been able to do without assistance.

The plaintiff testified that he continues to experience dizziness "when I'm sitting, when I get up, when I lay down, when I turn my head left to right." Pl.'s Mot. Partial Summ. J., Ex. 20, dep. of Ernest Durmishi, at 19. His wife still helps him stand; he holds onto her for a few moments after standing to calm his dizziness. The plaintiff does exercises at home to improve his balance with the assistance of his wife. He remains unable to walk outside on his own due to dizziness and requires his wife by his side in case he falls down. The plaintiff has not yet been certified to drive a vehicle again and relies on his wife for transportation. He also has memory problems and explained that "[w]hat I'm thinking now to tell you, in two minutes I don't recall or if I do something, let's say, if I took my medicine or not." *Id.* at 47. Based on his forgetfulness, some of the plaintiff's doctors, including Dr. Jay Meythaler from RIM, expressed concerns about the plaintiff's safety if left alone.

On September 8, 2008, the plaintiff began an outpatient rehabilitation program at RIM that spanned the next two months. The evaluator determined that the plaintiff required minimum to moderate assistance for most activities of daily living. The examiner noted that he had no

orientation to person, place, or situation, and seemed easily distracted. The examiner recommended 24-hour supervision based the plaintiff's potential for falling, poor gait, balance, right upper extremity function, safety and functional skills, endurance, mobility, community skills, and strength.

On October 21, 2008, the plaintiff was referred to Dr. Jennifer A. LaBuda, a licensed clinical psychologist at the Wayne State University Medical Group, for an assessment of his cognitive and affective functioning. Dr. LaBuda used an independent translator to interview the plaintiff and also received information from Mrs. Durmishi. She noted that "the patient demonstrates significant variability in daily therapy. At times he has evidenced progress, however, at other times, seems disengaged from treatment." Ans. to Pl.'s Mot. Summ. J., Ex. B, Report of LaBuda at 1.

On both September 22 and October 21, 2008, Dr. Lawrence Horn at RIM issued a prescription for the plaintiff to receive 24-hour attendant care and indicated that the termination date of such care was to be determined. On October 31, 2008, the plaintiff was discharged from the outpatient therapy program.

The record is not clear when the plaintiff first made a claim for no-fault insurance benefits. However, sometime after the accident the plaintiff applied for first-party benefits that included wage-loss differential and attendant care. He sent demand letters for coverage to The Scottsdale Insurance Company on December 5, 2008, January 9, 2009, January 29, 2009, and February 4, 2009, seeking attendant care benefits at the rate of $26.34 per hour, 24 hours per day, and wage-loss differential. The plaintiff received some workers' disability compensation payments from his employer's insurer, Liberty Mutual Insurance Company; however, Liberty Mutual refused to continue paying benefits after December 31, 2008. The plaintiff has stated that he has sued for worker's compensation benefits in the Michigan worker's compensation bureau. Since the motion

argument, plaintiff's counsel has informed the Court that Liberty Mutual has stated an intention to voluntarily pay additional benefits from December 8, 2008 through April 23, 2010; however no funds had been received yet.

The plaintiff hired Robert Ancell, Ph.D., and Laura Kling, RN, to conduct a vocational rehabilitation and case management evaluation of the plaintiff in his home to determine his need for attendant care and the value of Mrs. Durmishi's services. Ancell concluded that Mrs. Durmishi's service should be valued between $16.28 and $20.26 per hour, plus 30% for the value of a comparable in-home care worker's benefits. He justified 24-hour care on the basis of the prescriptions from Drs. Meythaler and Horn.

Dr. Ancell referred the plaintiff to Dr. Gerald A. Shiener, a psychiatrist, who reported his conclusions to Ancell in a letter dated April 16, 2009. Dr. Shiener determined that the plaintiff's current functioning level was poor, with a global assessment of functioning (GAF) of 40. He wrote that the plaintiff will continue to require supervision and attendant care, possibly permanently. On June 23, 2009, Dr. Shiener issued a prescription for 24 hour attendant care by a "Nurse's Aide/Family Member who attends to and cares for the patient due to physical injuries and/or subsequent surgery resulting in physical disability," covering the period of September 1, 2008 through June 23, 2009. Ans. to Pl.'s Mot. Partial Summ. J., Ex. F, Records of Dr. Shiener.

The plaintiff also began seeing Dr. Jay Meythaler again at RIM on a regular outpatient basis on January 26, 2009. Dr. Meythaler determined that the plaintiff's gait was slower, that there was some weakness in the plaintiff's lower right side, and that the plaintiff did have pain in his right shoulder, but the doctor determined that the plaintiff's mobility and strength had both improved. He prescribed additional medication and physical therapy. At that time, the doctor believed that 24-

hour attendant care was appropriate. However, on June 11, 2009, Dr. Meythaler's plan included consideration of reducing or eliminating home care to assist the plaintiff with independent living skills during the day and to ensure his safety in those tasks.

The plaintiff received neuropsychological testing from Bradley Sewick, a Ph.D. psychologist, on April 23, 2009. Dr. Sewick concluded that the plaintiff "demonstrates a number of cognitive, sensory-motor and emotional-behavioral problems" and requires "additional rehabilitation interventions." Pl.'s Mot. Partial Summ. J., Ex. 13, Report of Dr. Sewick. Dr. Sewick testified at his deposition that the plaintiff possibly could be left alone for "an hour or two now and then," but no more. Ans. to Pl.'s Mot. Partial Summ. J., Ex. G, dep. of Dr. Sewick.

Plaintiff's counsel also referred the plaintiff to Dr. Jack Belen, a psychiatrist, who examined Mr. Durmishi on August 20, 2009. That same day, Dr. Belen provided the plaintiff with a prescription for 24-hour attendant care. The prescription did not include a termination date. Dr. Belen examined the plaintiff again on October 1, 2009 and found that he continued to present with the same impairments.

The defendant apparently did not seek any physical or psychological examinations of the plaintiff until after the present lawsuit was filed on February 18, 2009. Since that time, Dr. Philip Liethen, a psychologist, examined the plaintiff on October 28, 2009 and administered psychological testing. He concluded that the plaintiff required supervision no more than twelve hours per day, and he opined that the plaintiff "is capable of far more functional independence than had been reported by he and his wife, as also had been demonstrated/documented at RIM." Ans. to Pl.'s Mot. Partial Summ. J., Ex. L, Dr. Liethen's report at 14.

On October 26, 2009, the plaintiff also appeared for an examination by Dr. Harvey Ager, a psychiatrist, with an independent interpreter. Dr. Ager determined that the plaintiff did not need any attendant care. Ager suggested that the plaintiff's problems were not the result of a close head injury, but more likely were caused by a vascular problem that developed alongside the ischemic episode shortly after surgery, resulting in a problem with the vision in his right eye and possible right-side weakness. He further opined that the plaintiff did not appear clinically depressed or anxious, never became angry or agitated, did not exhibit signs of post-traumatic stress disorder or confusion, had no problems with short or long term memory functions, and did not appear to be psychotic. He did notice that the plaintiff limped when he walked; however, he did not perform a physical examination of the plaintiff.

On December 4, 2009, the plaintiff presented for an examination by Dr. Antoine Geffrard, a physical medicine specialist. Dr. Geffrard interviewed the plaintiff through his wife and an independent interpreter simultaneously, conducted a physical examination, and found no physical problems with the plaintiff's range of motion in either shoulder, but noted motor sluggishness and reduced power in the right arm. He noted a defect in the plaintiff's gait but found no balance deficit. He concluded that the plaintiff did not need attendant care or any form of supervision or observation.

On December 3, 2009, Dr. Diane Hudson at Spectrum Rehabilitation Centers completed an Individual Psychotherapy Re-Evaluation and Community-Based Treatment Plan Update for the plaintiff. It is unclear from the report whether this update was prompted by the litigation or was part of a standard course of treatment. Dr. Hudson concluded that the plaintiff continued to rely on his cane, "move[d] slowly," and his "constant pain" was "evident." Pl.'s Mot. Partial Summ. J., Ex. 16, Spectrum Health Plan Update at 1. He continued to exhibit depression, inertia, fatigue, difficulty

concentrating, forgetfulness, dizziness, and right-side limitations.  He required "standby assist" when walking down stairs and continued to rely on his wife to help him bathe, dress, and groom himself.  Dr. Hudson recommended that he continue therapy and learn pain- and anger-management techniques.  She did not comment on the need for attendant care.

The defendant also submitted an affidavit by Sharon Tait, a nurse case manager at Professional Rehabilitation Services of Michigan, completed on March 3, 2010.  Ms. Tait only reviewed the plaintiff's medical records; she did not examine or interview the plaintiff.  She was critical of Dr. Sewick's conclusions, suggested that the plaintiff no longer needed 24-hour attendant care, concluded that attendant care should have been reduced from 24 to 12 hours on October 3, 2009, and stated that the plaintiff currently needs attendant care no more than four hours per day.

As mentioned above, the plaintiff filed the present action in the Wayne County, Michigan circuit court on February 18, 2009 against the Scottsdale Insurance Company.  The parties stipulated to substitute the present defendant, National Casualty Company, who then removed the action to this court.  Following the removal, the parties engaged in several discovery squabbles, largely relating to the defendant's requests for medical evaluations of the plaintiff by doctors of its choosing and with the defendant's own interpreters.  Rather than follow the procedures set forth in Federal Rule of Civil Procedure 35, the defendant served multiple notices for examinations by Drs. Liethen and Ager.  Plaintiff's counsel responded by letter that he would not produce his client for the examinations absent an order from the Court under Rule 35.  On October 5, 2009, the defendant filed a motion for summary judgment on the ground that the plaintiff would not submit to an examination, arguing that under the insurance contract, the plaintiff was obliged to "[c]ooperate with us in the investigation or settlement of the claim" and "[s]ubmit to examination at our expense, by physicians

of our choice, as often as we reasonably require." *See* Def.'s Mot. Partial Summ. J., Ex. I, Insurance Policy. On October 12, 2009, the plaintiff agreed to submit to the examinations if the defendant withdrew its motion for summary judgment. The defendant withdrew its motion for summary judgment on January 26, 2010, after all requested examinations had been completed.

Another dispute arose when the defendant sought an examination by Dr. Geffrard, who worked for RIM, one of the plaintiff's treating facilities. The Court resolved that dispute by entering an order following a motion hearing, which limited Dr. Geffrard's access to the plaintiff's medical records and treating sources.

On February 8, 2010, the defendant tendered checks in the amount of $112,673.20 to the plaintiff for a portion of the attendant care demanded. The plaintiff notes that the amount does not represent payment at the rate claimed, nor does it cover the entire period for 24-hours-per-day care. Nonetheless, the checks contained the legend that this portion of the attendant care was "undisputed." The checks were dated January 14, 2010. The record does not indicate whether the defendant is continuing to pay some part of the attendant care benefits demanded.

## II.

On February 12, 2010, the defendant filed a motion for partial summary judgment arguing that it is entitled as a matter of law to set off against attendant care payments an amount equal to eight hours per day at the applicable rate, because there is no factual dispute that the plaintiff was injured during the course of his employment, and that part of his attendant care benefit should be the obligation of the worker's compensation insurer. The defendant also contends that the plaintiff's refusal to submit to medical and psychological examinations violated its contractual and statutory rights, and therefore the defendant should not be held responsible for attorney's fees as a matter of

law.  The plaintiff has countered with a motion for summary judgment of his own, arguing that the

defendant's refusal to pay no-fault benefits it is statutorily and contractually obliged to pay cannot

be justified.  The plaintiff notes that the defendant possesses no medical opinion to contradict his

physicians' prescription for 24-hour attendant care benefits until October 29, 2009, and at present

there is no dispute that the plaintiff is entitled to at least twelve hours of attendant care per day, as

evidenced by the defendant's voluntary, although belated, payment.

The standards for evaluating a motion for summary judgment are well known but bear

repeating here.  As the Sixth Circuit recently explained:

> Both claimants and parties defending against a claim may move for summary
> judgment "with or without supporting affidavits."  Fed. R. Civ. P. 56(a), (b).  Such
> a motion presumes the absence of a genuine issue of material fact for trial.  The court
> must view the evidence and draw all reasonable inferences in favor of the
> non-moving party, and determine "whether the evidence presents a sufficient
> disagreement to require submission to a jury or whether it is so one-sided that one
> party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.
> 242, 251-52 (1986).  The party bringing the summary judgment motion has the initial
> burden of informing the district court of the basis for its motion and identifying
> portions of the record that demonstrate the absence of a genuine dispute over
> material facts.  *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*,
> 276 F.3d 845, 848 (6th Cir. 2002).  Once that occurs, the party opposing the motion
> then may not "rely on the hope that the trier of fact will disbelieve the movant's
> denial of a disputed fact" but must make an affirmative showing with proper
> evidence in order to defeat the motion.  *Street v. J.C. Bradford & Co.*, 886 F.2d
> 1472, 1479 (6th Cir. 1989).

*Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009).  In addition, when "'reviewing a

summary judgment motion, credibility judgments and weighing of the evidence are prohibited.

Rather, the evidence should be viewed in the light most favorable to the non-moving party. . . .

Thus, the facts and any inferences that can be drawn from those facts[] must be viewed in the light

most favorable to the non-moving party.'"  *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374

(6th Cir. 2009) (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (citations

omitted)); *see also Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003) ("In evaluating the evidence, [the district court] 'draw[s] all reasonable inferences therefrom in a light most favorable to the non-moving party.'") (quoting *PDV Midwest Ref., LLC v. Armada Oil & Gas Co.*, 305 F.3d 498, 505 (6th Cir. 2002)).

"[T]he party opposing the summary judgment motion must 'do more than simply show that there is some "metaphysical doubt as to the material facts."'" *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 800 (6th Cir. 1994), and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322-23. "Thus, the mere existence of a scintilla of evidence in support of the [opposing party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." *Ibid.* (quoting *Anderson*, 477 U.S. at 252) (internal quotation marks omitted).

In a defensive motion for summary judgment, the party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991).

When the moving party also bears the ultimate burden of persuasion, the movant's affidavits and other evidence not only must show the absence of a material fact issue, they also must carry that burden. *Vance v. Latimer*, 648 F. Supp. 2d 914, 919 (E.D. Mich. 2009) (stating that where "the crucial issue is one on which the movant will bear the ultimate burden of proof at trial, summary judgment can be entered only if the movant submits evidentiary materials to establish all of the elements of the claim or defense") (quoting *Stat-Tech Liquidating Trust v. Fenster*, 981 F. Supp. 1325, 1335 (D. Colo. 1997); *Resolution Trust Corp. v. Gill*, 960 F.2d 336, 340 (3d Cir. 1992). In his commentary on affirmative motions for summary judgment, Judge William Schwarzer explains:

> When the moving party bears the burden of persuasion on the issue at trial, its showing must sustain that burden as well as demonstrate the absence of a genuine dispute. Thus, it must satisfy both the initial burden of production on the summary judgment motion–by showing that no genuine dispute exists as to any material fact–and the ultimate burden of persuasion on the claim–by showing that it would be entitled to a directed verdict at trial.

William W. Schwarzer, et al., *The Analysis and Decision of Summary Judgment Motions*, 139 F.R.D. 441, 477-78 (1992) (footnote omitted).

This case is before the Court on the basis of diversity jurisdiction, 28 U.S.C. § 1332, and the plaintiff's claim is based entirely on state law. Therefore, the Court must apply the law of the forum state's highest court. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938). If the state's highest court has not decided an issue, then "the federal court must ascertain the state law from 'all relevant data.'" *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir. 1995) (quoting *Bailey v. V & O Press Co.*, 770 F.2d 601, 604 (6th Cir. 1985)). "Relevant data includes the state's intermediate appellate court decisions, as well as the state supreme court's relevant dicta, restatements of the law, law review commentaries, and the majority rule among other states."

*Ososki v. St. Paul Surplus Lines*, 156 F. Supp. 2d 669, 674 (E.D. Mich. 2001) (internal quotation marks and citation omitted).

A.

The defendant's argument that it is entitled to set off a portion of attendant care benefits that would be paid by a worker's compensation insurer is based on statutory language found in the no-fault act. The defendant does not dispute its statutory obligation to pay for attendant care that is incurred, reasonably necessary for the injured person's care and rehabilitation, and reasonable in amount. *See Nasser v. ACIA*, 435 Mich. 33, 48-49, 457 N.W.2d 637, 644-45 (1990); *Moghis v. Citizens Ins. Co. of Am.*, 187 Mich. App. 245, 247, 466 N.W.2d 290, 292 (1990). However, Michigan cases make clear that when enacting the no-fault automobile insurance act and the worker's disability compensation act, both of which are statutory schemes designated as substitutes for traditional tort reparations systems, the state legislature did not intend to countenance double recovery for a person injured in an automobile accident while on the job, even though "[n]either act refers expressly to the other." *Mathis v. Interstate Motor Freight Sys.*, 408 Mich. 164, 179, 289 N.W.2d 708, 712 (1980); *see also Wood v. Auto-Owners Ins. Co.*, 469 Mich. 401, 405-06, 668 N.W.2d 353, 355 (2003); *Booth v. Auto Owners Ins. Co.*, 224 Mich. App. 724, 731, 569 N.W.2d 903, 906 (1997); *DeMeglio v. Auto Club Ins. Ass'n*, 202 Mich. App. 361, 364, 509 N.W.2d 526, 527-28 (1993), *rev'd on other grounds*, 449 Mich. 33, 534 N.W.2d 665 (1995). The Michigan legislature specifically enacted legislation that states: "Benefits provided or required to be provided under the laws of any state or the federal government shall be subtracted from the personal protection insurance benefits otherwise payable for the injury." Mich. Comp. Laws § 500.3109(1). Michigan courts have interpreted this provision to mean that the "workers' compensation system should be

-14-

the primary insurer with respect to disabilities arising from an automobile accident at work." *Gregory v. Transam. Ins. Co.*, 425 Mich. 625, 631, 391 N.W.2d 312, 315 (1986).

The defendant has seized upon the language "required to be provided" in section 3109(1) as authority for the idea that where an injured employee is theoretically entitled under law to worker's compensation benefits, the no-fault insurer is entitled to withhold an equivalent amount from first-party no-fault benefits to be paid, regardless of whether the injured worker actually receives the worker's compensation benefits. After reviewing Michigan precedent, the Court does not find that argument to be sustainable.

The Michigan Supreme Court held in *Perez v. State Farm Mut. Auto. Ins. Co.*, 418 Mich. 634, 344 N.W.2d 773 (1983), that a worker injured on the job in an automobile accident, whose employer did not have mandatory worker's compensation coverage, could not be subject to the set-off prescribed by section 3109(1). The court explained, "[t]he 'required to be provided' clause does not mean that sums payable as workers' compensation that are not available to the injured worker because his employer failed to provide workers' compensation coverage are nonetheless to be subtracted from no-fault work-loss benefits." *Id.* at 645, 244 N.W.2d at 778. Instead, the court described the injured employee's obligation as follows:

> The "required to be provided" clause of § 3109(1) means that the injured person is obliged to use reasonable efforts to obtain payments that are available from a workers' compensation insurer. If workers' compensation payments are available to him, he does not have a choice of seeking workers' compensation or no-fault benefits; the no-fault insurer is entitled to subtract the available workers' compensation payments even if they are not in fact paid because of the failure of the injured person to use reasonable efforts to obtain them.

*Id.* at 645-46, 244 N.W.2d at 778-79.

Similarly, if an injured employee settles his worker's compensation claim, he may not then turn to his (or his employer's) no-fault insurer to recover benefits he otherwise would have received from his worker's compensation insurer on an on-going basis had he not settled his worker's compensation claim. *See Gregory*, 425 Mich. at 635, 636, 391 N.W.2d at 316, 317 (1986) (noting, however, that "the no-fault insurer remains liable for any benefits due which are greater than the amounts which the workers' compensation system is required by statute to pay to disabled workers").

The plaintiff acknowledges the vitality of the set-off provision in section 3109(1), but he insists that he is doing all that the law requires of him: he applied for worker's compensation benefits, and when he was refused, he pursued the matter through litigation against the worker's compensation insurer. Therefore, he says, he has employed "reasonable efforts to obtain payments that are available from a workers' compensation insurer," which is all *Perez* requires. He contends, however, that as the defendant has the burden of establishing its right to a set-off, *see Conway v. Cont. Ins. Co.*, 180 Mich. App. 447, 450, 447 N.W.2d 761, 762 (1989), the defendant cannot withhold payments awaiting the outcome of his worker's compensation case. The Court agrees. In *Specht v. Citizens Insurance Company of America*, 234 Mich. App. 292, 593 N.W.2d 670 (1999), the Michigan Court of Appeals held explicitly that "[w]here, as here, a claim for worker's compensation benefits is still pending when the no-fault carrier is sued for benefits, the no-fault carrier will be unable to prove its entitlement to a setoff. . . . [T]he no-fault carrier is not entitled to delay payments in order to wait for the bureau's determination." *Id.* at 296, 593 N.W.2d at 672. That proposition appears to be well settled under Michigan law. *See Joiner v. Mich. Mut. Ins. Co.*, 137 Mich. App. 464, 475, 357 N.W.2d 875 (1984) (holding that since the plaintiff's claim was

pending, "[d]efendant was unable to . . . and in fact did not attempt to" set off worker's compensation benefits against required first-party no-fault payments); *Joiner v. Mich. Mut. Ins. Co.*, 161 Mich. App. 285, 293, 409 N.W.2d 808 (1987) (holding that a setoff cannot be made until the amount of worker's compensation benefits to which plaintiff is entitled is finally determined).

Although the defendant will be able to set off worker's compensation payments for attendant care that the plaintiff actually receives, there is no evidence in the record that the plaintiff has received anything to date. The plaintiff has satisfied his obligation to make reasonable efforts to pursue his remedies under the worker's compensation statutes. The defendant is not allowed to speculate or anticipate the amount the plaintiff might receive, nor may it withhold benefits otherwise payable pending a determination by the worker's compensation bureau. The defendant's motion for summary judgment on this ground must be denied.

## B.

The defendant next argues that it is entitled to a judgment as a matter of law that the plaintiff may not recover attorney's fees because the plaintiff insisted on compliance with Federal Rule of Civil Procedure 35 as a condition of submitting to medical examinations by doctors of the defendant's choosing. The plaintiff wanted a showing of good cause and conditions imposed on the examinations as required by Rule 35; the defendant contends it has an unconditional right under a Michigan statute, *see* Mich. Comp. Laws § 500.3151, to examine the plaintiff. Michigan Complied Laws § 500.3148(1) states that "[a]n attorney is entitled to a reasonable fee for advising and representing a claimant in an action for . . . benefits which are overdue. . . charge[d] against the insurer . . . if the court finds that the insurer unreasonably refused to pay the claim or unreasonably delayed in making proper payment." The defendant reasons that if it is found to have delayed

payments, its delay must be deemed reasonable as a matter of law because the plaintiff breached its own obligation to submit to medical examinations, Rule 35 notwithstanding.

In order for a court to grant attorney's fees under section 500.3148, the following statutory prerequisites must be met:

> First, the benefits must be overdue, meaning "not paid within 30 days after [the] insurer receives reasonable proof of the fact and of the amount of loss sustained." Mich. Comp. Laws § 500.3142(2). Second, in postjudgment proceedings, the trial court must find that the insurer "unreasonably refused to pay the claim or unreasonably delayed in making proper payment." Mich. Comp. Laws § 500.3148(1).

*Moore v. Secura Ins.*, 482 Mich. 507, 517, 759 N.W.2d 833, 838 (2008). "Neither Michigan Compiled Laws § 500.3142(2) nor Michigan Compiled Laws § 500.3148(1) permits the recovery of attorney fees for actions in which a court awarded plaintiff benefits that were reasonably in dispute, or, stated slightly differently, benefits not yet overdue." *Id.* at 519, 759 N.W.2d at 839.

Most Michigan courts have determined that the issue whether the insurer's delay was reasonable presents a mixed question of law and fact. *Ross v. Auto Club Group*, 481 Mich. 1, 7, 748 N.W.2d 552, 555 (2008) (citing *Sweebe v. Sweebe*, 474 Mich. 151, 154, 712 N.W.2d 708 (2006)); *see also Tinnin v. Farmers Ins. Exch.*, --- Mich. App.--- , --- N.W.2d ---, 2010 WL 364187 (Feb. 2, 2010). "What constitutes reasonableness is a question of law, but whether the defendant's denial of benefits is reasonable under the particular facts of the case is a question of fact." *Ross*, 481 Mich. at 7, 748 N.W.2d at 555; *but see Regents of Univ. of Mich. v. State Farm Mut. Ins. Co.*, 250 Mich. App. 719, 737, 650 N.W.2d 129, 139 (2002) ("Subsection 3148(1) specifically provides that the court should determine whether an insurer unreasonably refused to pay or unreasonably delayed in making payment. Thus, this was not a question for the jury"). An initial refusal or delay by the defendant in paying benefits creates a rebuttable presumption of unreasonableness, and the

defendant then has the burden of justifying its refusal or delay. *Univ. Rehab. Alliance, Inc. v. Farm Bureau Gen. Ins. Co. of Mich.*, 483 Mich. 955, 956, 763 N.W.2d 908, 908 (2009) (citing *Ross*, 481 Mich. at 11, 748 N.W.2d 552). "[T]he scope of inquiry under § 3148 is not whether the insurer ultimately is held responsible for a given expense, but whether its initial refusal to pay the expense was unreasonable." *McCarthy v. Auto Club Ins. Ass'n*, 208 Mich. App. 97, 105, 527 N.W.2d 524, 527 (1994); *see also Univ. Rehab. Alliance*, 483 Mich. at 956, 763 N.W.2d at 908. "The insurer can meet this burden [of rebutting the presumption] by showing that the refusal or delay is the product of a legitimate question of statutory construction, constitutional law, or factual uncertainty" at the time the insurer declined to pay the benefits. *Ross*, 481 Mich. at 11, 748 N.W.2d at 558; *cf. Ivezaj v. Auto Club*, 275 Mich. App. 349, 354, 355, 737 N.W.2d 807, 810, 811 (2007) (discussing *McCarthy* and alternatively describing the relevant period of time as "at the time the plaintiff requested this coverage" and "at the time [the insurer] initially refused to make the payments.").

The centerpiece of the defendant's argument here is the decision in *Roberts v. Farmers Insurance Exchange*, 275 Mich. App. 58, 737 N.W.2d 332 (2007), which held that Michigan Compiled Laws § 500.3151 grants a no-fault insurer a statutory right to require the plaintiff to submit to an examination. In *Roberts*, the court interpreted the statute to create this right and to impose an analogous duty on the plaintiff to submit to an examination where his or her mental or physical condition was material to the claim. When the claimant repeatedly failed or refused to attend the examination, the court determined that she breached her duty under the statute, which raised legitimate statutory questions about her continuing entitlement to first-party benefits and the appropriate consequences for such a breach under the statute. Therefore, the court determined that

the insurer's suspension of benefits was reasonable, and the insurer was not liable for attorney's fees.

The statute cited by the *Roberts* court, Mich. Comp. Laws § 500.3151, states:

When the mental or physical condition of a person is material to a claim that has been or may be made for past or future personal protection insurance benefits, the person shall submit to mental or physical examination by physicians. A personal protection insurer may include reasonable provisions in a personal protection insurance policy for mental and physical examination of persons claiming personal protection insurance benefits.

Federal Rule of Civil Procedure 35 states that the federal court "may order a party whose mental or physical condition . . . is in controversy to submit to a physical or mental examination by a suitably licensed or certified examiner"; however, the order may be issued "only on motion for good cause and on notice to all parties and the person to be examined," and the order "must specify the time, place, manner, conditions, and scope of the examination, as well as the person or persons who will perform it." Fed. R. Civ. P. 35(a)(1), (2)(A)&(B). If Rule 35 governs, the plaintiff was well within his right to insist on a determination of good cause and to have the Court prescribe the conditions of the examination before submitting to the defendant's demand. The defendant argues, however, that the state statutory scheme creates substantive rights to which federal procedural prescriptions must yield when the matter is adjudicated by a federal court exercising its diversity jurisdiction.

The defendant's argument is flawed for several reasons. First, under the state statutory scheme, the defendant is not entitled to an unconditional right to a physical examination. Rather, under section 3159 of the no-fault act, an order compelling the discovery "of facts about an injured person's . . . condition, treatment and dates and costs of treatment" may be entered by a state court "only on motion for good cause shown and upon notice to all persons having an interest, and shall specify the time, place, manner, conditions and scope of the discovery." Mich. Comp. Laws §

500.3159.  The statute also states: "A court, in order to protect against annoyance, embarrassment or oppression, as justice requires, may enter an order refusing discovery or specifying conditions of discovery and may order payments of costs and expenses of the proceeding, including reasonable fees for the appearance of attorneys at the proceedings, as justice requires."  *Ibid.*

That plain statutory language would settle the issue (and avoid a collision with Rule 35), except that the Michigan Supreme Court engrafted upon it the provision that a no-fault insurer could alter the meaning of the statute through language in the insurance contract.  *See Muci v. State Farm Mut. Auto. Ins. Co.*, 478 Mich. 178, 194, 732 N.W.2d 88, 97 (2007) (holding that under the no-fault act, "the provisions of the parties' insurance policy control whether any conditions may be placed on independent medical examinations").   However, that reasoning, questionable in its own right, does not govern the application of Rule 35 in a federal court, which leads to the second flaw in the defendant's argument.

It is well settled that under the *Erie* doctrine, *see Erie R.R. v. Tompkins*, 304 U.S. 64 (1938), the Court must apply the substantive law of the state in which it sits, but must apply federal procedural law, provided that the federal rule "shall not abridge, enlarge or modify any substantive right."  *See* 28 U.S.C. § 2072(b).  The Supreme Court has held that Rule 35 is a rule of procedure, and in federal litigation "the District Court was not bound to follow the [state] practice respecting an order for physical examination."  *Sibbach v. Wilson & Co.*, 312 U.S. 1, 10 (1941).  The Supreme Court took the opportunity to expound on that holding just this term in *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. ---, 130 S. Ct. 1431 (2010), when it considered just when a federal procedure will be found to have "abridge[d], enlarge[d] or modif[ied]" a substantive right.

The question in *Shady Grove* was whether a New York statute that prohibited class actions in suits seeking penalties or minimum damages bound a federal court sitting in diversity, when Federal Rule of Civil Procedure 23 would have permitted such an action. The Court framed the issue thus: "We must first determine whether Rule 23 answers the question in dispute. . . . If it does, it governs – New York's law notwithstanding – unless it exceeds statutory authorization or Congress's rulemaking power." 130 S. Ct. at 1437. The Court answered the first question – whether Rule 23 applied in the case – in the affirmative. Rule 23 states that class actions may be maintained in federal courts if certain conditions are satisfied; the New York law prohibiting class actions was in direct conflict with the federal rule. The Court also concluded that Rule 23 fell within the statutory authorization; but there was no majority on the reason why.

The plurality focused solely on the federal rule under examination to determine whether the rule "regulate[s] matters 'rationally capable of classification' as procedure." *Id.* at 1442 (quoting *Hanna v. Plumer*, 380 U.S. 460, 472 (1965)). If so, the Rules Enabling Act authorizes the federal rule under the "Supreme Court['s] . . . power to prescribe general rules of practice and procedure," 28 U.S.C. § 2072(a), unless "[s]uch rule[] . . . abridge[s], enlarge[s] or modif[ies] any substantive right." 28 U.S.C. § 2072(b). The plurality stated that if the rule "really regulat[es] procedure," *Shady Grove*, 130 S. Ct. at 1442 (quoting *Sibbach*, 312 U.S. at 14), it is valid. It defined "procedure" as "the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them." *Ibid.* (quoting *Sibbach*, 312 U.S. at 14). According to the plurality, it matters not that the rule "affects" a litigant's substantive rights, as "most procedural rules do." *Ibid.* "What matters is what the rule itself regulates: If it governs only 'the manner and the means' by which the litigants' rights are 'enforced,'

-22-

it is valid; if it alters 'the rules of decision by which [the] court will adjudicate [those] rights,' it is not." *Ibid.* (quoting *Miss. Publ'g Corp. v. Murphree*, 326 U.S. 438, 446 (1946)). The plurality found that Rule 23 easily satisfied this test.

Justice Stevens concurred in the judgment. He noted that the Rules of Decision Act, 28 U.S.C. § 1652, which requires state laws to "be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply," does not apply when an issue is governed by a federal rule; in that case, the Rules Enabling Act controls. Justice Stevens would broaden the focus of the Rules Enabling Act inquiry to include the "the nature of the state law that is being displaced by a federal rule." *Id.* at 1449 (Stevens, J., concurring). Justice Stevens would allow that "[a] state procedural rule, though undeniably 'procedural' in the ordinary sense of the term, may exist to influence substantive outcomes, and may in some instances become so bound up with the state-created right or remedy that it defines the scope of that substantive right or remedy." *Id.* at 1450 (Stevens, J., concurring) (internal quotation marks and citation omitted). In his view, in order to comply with the Rules Enabling Act, "[w]hen a State chooses to use a traditionally procedural vehicle as a means of defining the scope of substantive rights or remedies, federal courts must recognize and respect that choice." *Ibid.* He would hold that the Rules Enabling Act would not permit a "federal rule . . . [to] govern a particular case in which the rule would displace a state law that is procedural in the ordinary use of the term but is so intertwined with a state right or remedy that it functions to define the scope of the state-created right." *Id.* at 1452 (Stevens, J., concurring). Applying that test, Justice Stevens concluded that the New York law limiting the availability of class actions and constricting the scope of damages did not create substantive rights or remedies, and therefore Rule 23, which collided with that state law, satisfied the Rules Enabling Act.

Following either approach, it is not difficult to conclude that the application of Rule 35 to the present dispute does not violate the Rules Enabling Act. Rule 35 is unquestionably a rule of procedure; its purpose is to regulate access to proof through different modes of discovery during the course of litigation. It does not prescribe rights or remedies. Instead, it merely sets forth a process for obtaining information that might bear on a matter in controversy. The suggestion that Rule 35 is anything more than a rule of procedure was soundly rejected by the Supreme Court in *Sibbach*:

> The petitioner says the phrase ["substantive rights"] connotes more; that by its use Congress intended that in regulating procedure this court should not deal with important and substantial rights theretofore recognized. Recognized where and by whom? The state courts are divided as to the power in the absence of statute to order a physical examination. In a number such an order is authorized by statute or rule. . . .
>
> The asserted right, moreover, is no more important than many others enjoyed by litigants in District Courts sitting in the several states, before the Federal Rules of Civil Procedure altered and abolished old rights or privileges and created new ones in connection with the conduct of litigation. The suggestion that the rule offends the important right to freedom from invasion of the person ignores the fact that as we hold, no invasion of freedom from personal restraint attaches to refusal so to comply with its provisions. If we were to adopt the suggested criterion of the importance of the alleged right we should invite endless litigation and confusion worse confounded. The test must be whether a rule really regulates procedure, – the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them. That the rules in question are such is admitted.

*Sibbach*, 312 U.S. at 13-14 (footnotes omitted).

Nor does Rule 35 abridge a state substantive right that is embedded in a procedural statute. The defendant suggests that state law defines its right to demand an examination from a first-party no-fault claimant as a substantive right. That argument is based on the state supreme court's anemic definition of "substantive right" found in *Muci*, as a rule or statute "that has '"as its basis something other than court administration."'" *Muci*, 478 Mich. at 191, 732 N.W.2d at 96 (quoting *McDougall*

-24-

*v. Schanz*, 461 Mich. 15, 31, 597 N.W.2d 148, 156 (1999)). That definition conflicts with federal law. *See Sibbach*, 312 U.S. at 14 (defining "procedure" much more broadly than merely "court administration"). Like Rule 35, the state statutes, Mich. Comp. Laws §§ 500.3151, .3159, do no more than regulate access to proof. They do not set forth elements of claims or prescribe rights or remedies. These state laws do not affect the statutory cause of action or adjust the plaintiff's obligation to prove that the costs of attendant care have been incurred, are necessary, and are reasonable. They are not "so bound up with the state-created right or remedy that it defines the scope of that substantive right or remedy." *Shady Grove*, 130 S. Ct. at 1450 (Stevens, J., concurring). The state statutes prescribe a rule of procedure and nothing more.

The plaintiff's insistence on compliance with Rule 35 does not by itself justify the defendant's delay in payment of benefits that otherwise were "overdue" within the meaning of the no-fault act. Although the defendant still may be able to rebut the inference that the delay was unreasonable, it is not entitled to a determination to that effect as a matter of law. The defendant suggests that the outcome on this issue would be different in state court. Perhaps that is so. However, in our federal system, "federal courts sitting in diversity operate as an independent system for administering justice to litigants who properly invoke its jurisdiction . . . and not as state-court clones that assume all aspects of state tribunals." *Shady Grove*, 130 S. Ct. at 1448-49 (Stevens, J., concurring). Having removed this dispute to federal court, the defendant is bound to follow the applicable federal procedural rules. The defendant's motion for partial summary judgment on that ground, therefore, will be denied.

C.

The plaintiff moves for partial summary judgment as well. He seeks a judgment requiring the defendant to pay the total amount of 24-hour attendant care benefits at the rate of $26.34 per hour, which amounts to $424,275.28 through the date of the motion filing. The plaintiff argues that there is no genuine issue of material fact concerning the appropriateness of the amount due and owing because the defendant has paid some of this money in checks stating that the benefits were "undisputed" and in doing so has allegedly conceded that it owes the money. However, the plaintiff also points out that the defendant's payments were for the "incorrect" hourly rate and number of hours. Nonetheless, the plaintiff insists that he is entitled to judgment as a matter of law.

The Court disagrees. As the defendant points out, the plaintiff has the burden of demonstrating the reasonableness of the amounts he seeks, that these expenses are reasonably necessary, and that the plaintiff actually incurred these expenses. *Nasser v. ACIA*, 435 Mich. 33, 48-49, 457 N.W.2d 637, 644-45 (1990). The plaintiff has provided medical records and reports from Drs. Horn, Ancell, Shiener, Meythaler, Sewick, Belen, and Hudson tending to support his claim that he required 24-hour attendant care, as well as testimony from the plaintiff and his wife detailing the types of care she provided him. The plaintiff also has included the information he provided to the insurers to support his initial claim for benefits, which the plaintiff describes as "reasonable proof." However, these documents merely list figures for the different categories of the plaintiff's loss and provide no evidentiary support for the requested amounts. Notably, none of the letters containing "reasonable proof" were addressed to the present defendant.

The defendant has responded with medical records and reports from Drs. Meythaler, Mazhari, Liethen, Ager, Geffrard, and nurse Tait tending to show that, although the plaintiff may have required 24-hour attendant care at some point following his accident, he had improved

cognitively and physically so that he no longer required attendant care for more than 12 hours per day, if that.  The defendant also questions the amount of care provided by the plaintiff's wife, suggesting that it would be impossible for one person to provide 24 hours worth of care while also caring for herself.

In general, "[w]hether expenses are reasonable and reasonably necessary is generally a question of fact to be resolved by the jury."  *Kallabat v. State Farm Ins.*, 256 Mich. App. 146, 151, 662 N.W.2d 97, 100 (2003).  Drawing all reasonable inferences in favor of the defendant, these conflicting reports demonstrate a genuine issue of material fact as to the amount of care the plaintiff required and when, if at all, his need for care dropped from 24 to less than 12 hours.  Further, there remains a factual question about the type and amount of care the plaintiff's wife provided and the extent to which the plaintiff was capable of functioning on his own.  These material issues require an evaluation of the facts properly performed by a jury.

In addition, viewing the defendant's payments in the light most favorable to the defendant, the jury could conclude that the defendant considered the claim for a certain portion of the attendant care benefits to be undisputed and paid only that portion of the benefits.  At no point during the lawsuit has the defendant argued that it is not responsible for at least some of the attendant care benefits, but has merely contested the amount, and claimed a right to a setoff for worker's compensation payments.  The defendant's payments, therefore, need not be viewed as a concession that the defendant owes all requested benefits.

However, the defendant apparently does not contest that the plaintiff has required at least 12 hours of attendant care from the time of his discharge through December 2009.  As noted, the defendant did pay some benefits for attendant care on February 8, 2010 with checks dated January

14, 2010. The defendant received medical reports from its own examiners, Drs. Liethen, Ager, and Geffrard, on October 28, 2009, October 26, 2009, and December 4, 2009, respectively, which apparently substantiated at least part of the plaintiff's claims to the defendant's satisfaction. Therefore, by December 4, 2009 at the latest, the defendant had reasonable proof that the plaintiff required some attendant care. At that point, the 30-day clock on this portion of the claim began to run. The defendant failed to pay any benefits until almost two months later. Therefore, no material fact dispute exists that the defendant is liable for penalty interest and fees as to the initial 12 hours of attendant care benefits paid by the defendant on February 8, 2010. The remaining portion of benefits must await a determination whether they were reasonably in dispute, and therefore the plaintiff is not entitled to an award of penalty interest and fees as to the balance of his claim at this time. Therefore, the Court will grant in part and deny in part the plaintiff's motion for partial summary judgment.

### III.

Finally, the defendant has moved to strike the potential testimony of the plaintiff's vocational rehabilitation expert, Dr. Robert Ancell. It argues that Ancell's opinion on the value of Mrs. Durmishi's attendant care of her husband is irrelevant because Mrs. Durmishi is not qualified for the classification utilized by Ancell or entitled to receive the wages Ancell recommended, based on her own testimony about the care she provides her husband. In addition, the defendant argues that Dr. Ancell's testimony is not based on specialized knowledge, and the opinions he offers can be established by Mrs. Durmishi's testimony alone, and therefore Ancell's opinions will not be helpful to a jury.

Traditionally, attendant care benefits for persons injured in automobile accidents are furnished by licensed care providers, who charge rates that are reasonable and customary in the market, the payment of which generally is negotiated directly between the care provider and the insurance carrier. Michigan courts have also approved no-fault compensation for attendant care provided by family members of the injured individual. *Booth v. Auto-Owners Ins. Co.*, 224 Mich. App. 724, 727-29, 569 N.W.2d 903, 904-05 (1997) (citing *Reed v. Citizens Ins. Co. of Am.*, 198 Mich. App. 443, 499 N.W.2d 22 (1993), *Botsford Gen. Hosp. v. Citizens Ins. Co.*, 195 Mich. App. 127, 489 N.W.2d 137 (1992), *Van Marter v. Am. Fid. Fire Ins. Co.*, 114 Mich. App. 171, 318 N.W.2d 679 (1982), and *Visconti v. DAIIE*, 90 Mich. App. 477, 282 N.W.2d 360 (1979)). In such cases, the plaintiff bears the burden of demonstrating that the amount of compensation is reasonable and the care provided is appropriate. *See Bonkowski v. Allstate Ins. Co.*, 281 Mich. App. 154, 172, 761 N.W.2d 784, 795 (2008); *Attard v. Citizens Ins. Co. of Am.*, 237 Mich. App. 311, 317-18, 602 N.W.2d 633, 637 (1999).

The defendant argues that Dr. Ancell's testimony will not illuminate that inquiry and that the jury can figure out a reasonable rate of compensation on its own. In support of the former proposition, the defendant contends that Dr. Ancell's methods do not comply with Michigan law, since he uses home health care workers as comparators and Mrs. Durmishi's skill level is not equivalent to theirs; and the rates they charge is not a proper measure of reasonable compensation for Mrs. Durmishi. In support of the latter proposition, the defendant characterizes Dr. Ancell's function as interviewing the plaintiff's wife, accepting the responses she provides, comparing those responses to published guidelines, and valuing the work based on the matching classification; and

then simply states that "Ancell is . . . no more qualified to perform such a task than are the ordinary men and women that will make up the jury." Br. in Support of Def.'s Mot. Strike at 4.

Any challenge to expert testimony must begin with Rule 702 of the Federal Rules of Evidence, which was modified in December 2000 to reflect the Supreme Court's emphasis in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), on the trial court's gate-keeping obligation to conduct a preliminary assessment of relevance and reliability whenever a witness testifies to an opinion based on some sort of specialized knowledge. Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The language added by the amendment to Rule 702 restates *Daubert*'s insistence on the requirements that an expert's opinion be based on a foundation grounded in the actual facts of the case, that the opinion is valid according to the discipline that furnished the base of special knowledge, and that the expert appropriately "fits" the facts of the case into the theories and methods he or she espouses. *See Daubert*, 509 U.S. at 591-93.

In addition, expert testimony is not admissible unless it will be helpful to the fact finder. Such testimony is unhelpful when it is unreliable or irrelevant, as the Court observed in *Daubert*, *see id.* at 591-92, and also when it merely deals with a proposition that is not beyond the ken of common knowledge. *See, e.g.*, *Berry v. City of Detroit*, 25 F.3d 1342, 1350 (6th Cir. 1994) ("If everyone knows this, then we do not need an expert because the testimony will not 'assist the trier

of fact to understand the evidence or to determine a fact in issue.'") (quoting Rule 702)). Finally, before an expert may give an opinion, the witness must be qualified to do so. *See id.* at 1348-50; *Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 516 (6th Cir. 1998). The proponent of expert testimony must establish all the foundational elements of admissibility by a preponderance of proof. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10).

An opinion is "reliable" from an evidentiary standpoint if it is "valid" according to the discipline upon which it is based. *See Daubert*, 509 U.S. at 590. In determining validity, the Court's focus is on principles and methodology, not results. And there is no precise formula by which a court might deem a methodology "acceptable" or "unacceptable." *Daubert* and its progeny have therefore not created a straitjacket, *Gross v. Comm'r of Internal Revenue*, 272 F.3d 333, 339 (6th Cir. 2001), but rather counsel a flexible approach, reconciling the "liberal thrust" of Rule 702 which "relax[es] the traditional barriers to opinion testimony" with the responsibility to "screen[ ] such evidence" in order to keep unreliable or invalid opinions from the jury. *See Daubert*, 509 U.S. at 588-89 (internal citations and quotation marks omitted); *see also Jahn v. Equine Serv., PSC*, 233 F.3d 382, 388 (6th Cir. 2000).

The Court believes that Dr. Ancell likely is qualified to provide an opinion on reasonable rates of compensation for home health care workers. He is a currently a Rehabilitation Consultant with Ancell & Associates, which performs vocational rehabilitation consultation, medical rehabilitation consultation, and case management services. He has a Bachelor's degree in Psychology from Wayne State University, a Masters in Counseling from the University of Detroit, and a Ph.D. in Human Services from Walden University. He is a certified rehabilitation counselor

and a certified case manager. He has worked in the rehabilitation and counseling field in various positions since 1967. He has received many professional awards for his work in rehabilitation services and is a member of about 20 professional organizations.

The plaintiff was referred to Dr. Ancell by his attorney, Timothy Sulloli, to conduct "an evaluation as to his need for attendant care and the relative value of that." Resp. to Mot. Strike, Ex. 2, dep of Dr. Ancell, at 9, 16, 34. Dr. Ancell and nurse Laura Kling "evaluated Ernest and took a history . . . from the wife and observed him" in his house. *Id.* at 10, 22. This history included both the plaintiff's and his wife's background and relied on an open-ended questioning method. *Id.* at 10, 27-29, 33. Although Dr. Ancell agreed that he did not write prescriptions for attendant care, he testified that doctors often rely on his expertise and recommendations in prescribing attendant care. *Id.* at 9-11. In his deposition, Dr. Ancell explained the difference between rate of pay, which varies based on the employer, and value of services, which attempts to reflect fair market value for services. *Id.* at 16-17. He also explained the process in which he engages when determining the value of attendant care services: first, he compares the services performed to those listed on Michigan Civil Service job descriptions and looks to the associated rate of pay for the analogous governmental job category; then, he compares this rate to the rate of pay for comparable services in a private agency; finally, he compares this data to his personal experience of rates for comparable services. *Id.* at 17-18, 35-38, 41-47, 49-51, 52-53, 56, 57, 62-64, 67, 77-79. Dr. Ancell also explained how he calculates and incorporates, or why he does not incorporate, different benefits and costs. *Id.* at 18-21, 36-37, 58, 60-62, 75-76. Finally, Dr. Ancell also testified that, if presented with a 12 hour prescription and a 24 hour prescription from doctors of two different disciplines, he would look at both prescriptions and ultimately default to the higher number; here, he would proceed under

the 24 hour prescription.  *Id.* at 71-72.  He also stated that he would default to treating doctors.  *Id.* at 72.         This approach appears to be consistent with Michigan law as a method of calculating the value of attendant care services under the Michigan no-fault act.  In *Bonkowski v. Allstate Insurance Company*, the court explained:

> In determining reasonable compensation for an unlicensed person who provides health care services, a fact-finder may consider the compensation paid to licensed health care professionals who provide similar services. . . . For this reason, consideration of the compensation paid by health care agencies to their licensed health care employees for rendering services similar to the services provided by unlicensed family members is appropriate when determining reasonable compensation for those family members.  However, the actual charges assessed by health care agencies in the business of providing such services is not relevant and provides no assistance in determining reasonable compensation for the actual provider of such services.  The focus should be on the compensation provided to the person providing the services, not the charge assessed by an agency that hires health care professionals to provide such services.

*Bonkowski*, 281 Mich. App. at 164-65, 761 N.W.2d at 791.

The method used by Dr. Ancell to arrive at an opinion on the value of attendant care services provided by Mrs. Durmishi, therefore, appears to be consistent with the methodology countenanced by the Michigan courts.  Although there does not appear to be an "industry" standard for making such determinations, the state courts have established a methodology that produces a satisfactory result in litigation.  That satisfies the demands of Rule 702 and *Daubert*.  Although the four traditional *Daubert* factors for determining reliability – developed for scientific fields with publications and computed error rates, etc. – do not map easily onto the social-science context, the Supreme Court has held that these factors "neither necessarily nor exclusively appl[y] to all experts or in every case."  *Kumho Tire*, 526 U.S. at 141, 153.  Instead, the Court enjoys "broad latitude" in determining whether any such factors are "reasonable measures of reliability in a particular case."  *Id.* at 153.  The expert must satisfy the trial court that he "employs in the courtroom the same level

of intellectual rigor that characterizes the practice of an expert in the relevant field," *Id.* at 152, and can do so by explaining not only what he did to reach his conclusion, but why and how he arrived at his result as well. Dr. Ancell's proposed testimony meets these requirements.

Dr. Ancell has laid out the detailed methodology by which he typically considers these cases. The method is straight-forward and comprised of relatively simple comparisons. Therefore, it would be easy both for the expert to explain his method and for the jury to replicate his process on their own. The defendant argues that because the jury could do this on their own, the expert is unnecessary. However, Dr. Ancell has a knowledge of the industry that informs his method and that would be helpful to the jury in making its comparisons and determining which costs to include in its hourly rate. Dr. Ancell testified about the rates paid to private agencies and which portions of these rates he excludes, as well as why he rejected certain metrics based on their summary of irrelevant portions of the industry. This type of specialized knowledge would be beneficial to the jury.

The Court finds, therefore, that the defendant has demonstrated no basis on which to exclude Dr. Ancell's proposed testimony on the value of attendant care provided by Mrs. Durmishi to her husband. Of course, the need for the care and whether and to what extent it was reasonable likely is beyond the scope of Dr. Ancell's expertise. That evidence must be furnished by qualified health care professionals. The motion to strike Dr. Ancell's valuation testimony, however, will be denied.

IV.

The Court finds that the defendant is not entitled to a judgment as a mater of law on the issues of setoff and attorney's fees. The plaintiff is entitled to a judgment as a matter of law on the narrow issue of penalty interest and attorney's fees for overdue benefits from thirty days after

December 4, 2009 until the attendant care benefits were paid, but fact issues preclude summary judgment in his favor for the remainder of his claim. There is no basis in the present record upon which to strike Dr. Robert Ancell's proposed testimony.

Accordingly, it is **ORDERED** that the defendant's motion for partial summary judgment [dkt #38] is **DENIED**.

It is further **ORDERED** that the plaintiff's motion for partial summary judgment [dkt #40] is **GRANTED IN PART AND DENIED IN PART**. The plaintiff is entitled to an award of reasonable attorney's fees and penalty interest for overdue benefits from thirty days after December 4, 2009 until the attendant care benefits were paid, and nothing more. The plaintiff's motion is denied in all other respects.

It is further **ORDERED** that the defendant's motion to strike the testimony of the plaintiff's expert witness Robert Ancell [dkt #39] is **DENIED**.

It is further **ORDERED** that the parties shall appear for a final pretrial conference in accordance with the Case Management and Scheduling Order on **August 5, 2010 at 2:30 p.m.**; the parties shall present their proposed joint final pretrial order to chambers **on or before July 29, 2010**; and trial shall commence on **August 17, 2010 at 8:30 a.m.**

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   June 30, 2010

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 30, 2010.

s/Teresa Scott-Feijoo
TERESA SCOTT-FEIJOO